Good morning, Your Honors. Michael Tanaka, appearing on behalf of Appellant Cardiel. In this case, the vast majority of the evidence that was admitted against Mr. Cardiel involved conversations between the confidential informant and a whole host of other people involving the informant's quest to buy cocaine. Was he tried by himself? Yes, he was. Was he the only defendant? He was the only defendant. And were you counsel? No, I was not. But your office was? Our office was, yes. But I personally wasn't. So we talked to the informant talked to Mr. Martinez and Mr. Perez, the supposed heads of this Mexican drug cartel. He talked to someone that went by the name Alf Pagino about a couple of deals. He talked to someone named Flacco. But he didn't talk to Mr. Cardiel. Nonetheless, all these conversations formed the vast bulk of the evidence admitted against Mr. Cardiel and the vast bulk of the case against Mr. Cardiel. The problem with that is that did the informant testify? Pardon? Did the confidential informant testify? Yes, he did. Okay. So that was the way all this was brought in through his he testified and he submitted he authenticated the tapes, et cetera? There was also many of these conversations were taped, and the government presented the testimony of an agent who had overheard the conversations and then explained it for the benefit of the jury what all these cryptic references meant, to give them the context that the informant certainly didn't. The conversations that the tapes contained words uttered by your client? No. Not ever. Not a single word. Not a single word. Uttered by my client on any of those tapes. Right. And that's the problem with this case. In this case, they were all admitted broadly and without any analysis under the co-conspirator exception of the hearsay rule. Now, in order for that to be properly admitted, there had to be a foundational showing that, one, there was some conspiracy, two, that my client was part of that conspiracy and knew about it, and three, that the statements were made in furtherance of that conspiracy. What's missing here is any connection between Mr. Cardiel and most of the statements made on that tape about that so-called conspiracy. That conspiracy, as defined by the government, is so broad that it would include practically anyone that Mr. Perez and Mr. Martinez ever spoke with. Well, wait. Now, your client gets into the soup because he shows up with the goods. That's correct, Your Honor. That the people are, I gather, now, you haven't put in your briefs, or at least I haven't picked up entirely on the content of all of these conversations by the people who are ostensibly co-conspirators. But as I get the picture, what was described to the jury is they get all these conversations by people that the government claims are co-conspirators, all kinds of statements made to this informant about what this transaction is going to look like, and when the transaction comes to pass, your client shows up with the goods.  That's partially right. What's right? There are some conversations about the transaction that my client was involved in. There are also a large number of conversations about other transactions that my client had nothing to do with. All within the scope of the grandiose amounts of goods that were going to be delivered. What are we talking about, 200 kilograms or something? There was some reference to 200 kilograms. And a number of these transactions that actually occurred were still within the scope or within at least the numerical scope of the 200 kilograms, right? Some of them were, some of them weren't. Some of them were not? Some of them were not. There was some conversation between the informant and, I guess, a middleman, Pagino, about the transfer of cocaine that apparently had a source other than Martinez and Perez, who were responsible for these 200 kilograms. And that was admitted. But your client, your client's conduct in delivering the goods fit into the description or fit into the conspiracy that was shown to the jury, true? Some of it. Well, is that your point, then? It's not that none of it did. Your point is that some of it. That's correct, Your Honor. I'm not. I don't. Is it your point, then, that the government overdid it in putting in these tapes? Yes. And that's precisely the problem with these types of cases, is that my client is, at the most, someone who shows up at the very tail end of this, someone who's very peripherally involved. Well, he's delivering the goods. He's in the van, supposedly. And anybody who was delivering the goods, I suppose, there would have been as much evidence as against your client. The jury certainly had some dispute with that, since they acquitted him on the subsequent count of delivering the goods and having that in his possession. So although there was certainly evidence of that, it's certainly not conclusive. But the informant also told the informant that this is the van he used for drug deliveries. That's what the informant testified to. But again, he could. But that was legitimate testimony, though. The informant said, he told me this. Yeah. I have no problem with that testimony, but that's not the testimony we're contesting. And obviously, there were. Was that tape? No, that was not tape. And there were problems with that testimony because the informant also said, yeah, he showed me the 65 kilos. He had them right there. And, you know, they talked about the sale. But the jury acquitted Mr. Cardiel on the subsequent count of possession for purposes of sale. So obviously, if they believed the informant, they would have convicted him of that as well. So that's the problem with this case, that a lot of peripheral material comes in these tapes that paint Mr. Cardiel as this canine with the tar of Mr. Martinez, Mr. Perez, this Mexican drug cartel. And, you know, Mr. Cardiel is just someone who's worked for 10 years, has two kids in the family, and now he's all of a sudden some major player in this Mexican drug cartel. And it's just not fair to wholesale indiscriminately, isn't it always? There had to be some parsing of these conversations to make sure that if we're going to say that he's part of this conspiracy, then let's trace it up. Let's make sure that this transaction comes down, is somehow connected, or this conversation is somehow connected to the transaction that Mr. Cardiel is in charge with. Let's not omit conversations about other transactions. Let's not omit conversations about deals between the informant and some middleman that's pulled outside of this chain. Let's not omit all of this stuff without making some determination of what was and what wasn't. Let's not just call it co-conspirator statements, and the whole lot of it comes in. And that's my point. Very well. Good morning again, Mark Young, on behalf of the United States. I'm glad that there's no problem with this indictment. But other than that, Your Honors, what defendant ---- Well, I haven't looked at it that closely. Maybe we can get back to it. What defendant ---- I think what's inaccurate about the defendant's argument is that the 64 kilograms were part of the 200-kilogram cocaine deal that 98 or 99 percent of all the admitted conversations were regarding. There was a deal between Martinez and Perez who were in Mexico to supply the informant with 200 kilograms, and it was going to be done piecemeal. One of the individuals who was going to supply him with a portion of that cocaine was a man at the time only known as El Pinguino, later identified as Jesus Kiwis. Jesus Kiwis has a meeting with the informant and a man named, I guess probably confusing with names, Enrique Bayo. Enrique Bayo, on March 26th, Enrique Bayo leaves that meeting after they discuss getting 64 kilograms the next day and goes in his observed meeting with an unknown individual in the defendant's van, March 26th. March 27th, again, it's Enrique Bayo arranging for the informant and El Pinguino to meet with this van to get these drugs. Enrique Bayo doesn't show up to the meeting. El Pinguino does, the informant does, and the defendant does. And there are conversations in the van that were tape recorded. I would like to bring that to the Court's attention. The CI was wearing a tape. What happened, however, is the tape was not the best quality, and the defendant made a motion to exclude the tape because a defendant argued it was more inaudible than it was audible. It's not unusual, is it? It's not unusual at all. You get poor quality tapes. That's correct, Your Honor, because when you're wearing a wire, as your body moves, it makes sound that can overwhelm the sound of voices, or as you get further away from the receiving end of the wire, it becomes difficult. And the government fought to have these tapes submitted because there was important corroborating evidence in those tapes, and I think it's in the record in terms of the government's papers, for instance, where the informant is in the van saying, I see 34. You know, that corroborates, obviously, his testimony at trial that he saw 34 kilograms of cocaine in the van. So there is important corroboration. Now, again, 98 or 99 percent of all the introspective, excuse me, the tape conversations and the recorded meetings have to do with this 200-kilogram deal. At some point, the defendant is correct in that El Pinguino offered a side deal to the informant, but there was no way to separate out this side deal from the 200-kilo deal. It was all inextricably intertwined. Let me ask you a question. Why did you need to go through all that to get the guy with the goods? Well, first, Ronnie, you're dealing with an informant. Obviously, jurors are very often suspect when they deal with an informant who is cooperating with the government in return for benefits. That's the first issue. Secondly, due to an ---- And that's what the government ought to be suspect, too. That's correct, and that's why everything is tape recorded in this case. But here, the tape recordings weren't the best quality. They ended up being excluded. So, again, it was important to have more corroboration. And perhaps the most damaging part and the hardest part for the government to overcome was that the van was stopped by law enforcement, but because the individual made a mistake and let the van go and let the cocaine go. So there wasn't the seizure at the end of the day to show what the informant was saying was correct. So what the government needed to do was establish through a long series of very clear phone calls the process by which the defendant was showing up on March 27th in order to deliver 64 of the 200 kilograms of cocaine that Martinez and Perez had promised to the informant. And that was why it was important. So that's right, when he was stopped by law enforcement, they let him go. That's correct. I believe the testimony at trial, he was waiting for a supervisor's permission. It became too long of a stop. It became 10 or 15 minutes. So he wanted to let it go because at that point he believed it was becoming a detention and he didn't have any authority. So he didn't search the van and he let the van go. So in this case, the co-conspirator statements were correctly admitted. Defendant cites, I believe, a couple of cases, Zavala, Serra specifically, for the proposition that you can't have a conspiracy between a defendant and an informant only. And that's correct, but that's not the law, the state of the law in terms of co-conspirator statements. Here there were co-conspirator statements made to the CI, and those are admissible. While certainly you can't have an actual legal conspiracy solely with the CI, that was not the case here. You had a conspiracy between Martin Angel. Oh, go ahead. I'm sorry, you had a conspiracy between the two individuals in Mexico, El Pinguino, Enrique Bello, there were a few others, and the defendant. So there was a much broader conspiracy than just a single one-on-one conspiracy. Now, anything that this informant said on these tapes was heard by the jury as under a theory that the government advances that that's part of the whole conversation. That's correct, Your Honor. Now, I have to acknowledge that I have not studied these tapes, and I take the transcript as voluminous. That's correct, Your Honor. But something presumably was said on these tapes about where this delivery was to be made. Am I right so far? That's right, Your Honor. And that the place of the delivery where the defendant showed up with the goods is a place that is identified in the tapes. I'm not sure if it's identified in the tape or through the CI's testimony, because I believe the last discussion regarding the location was made in person in a tape-recorded meeting, as opposed to over the telephone. I would have to go back and look at the record to ensure that, Your Honor. Well, how then do you link up the conversation that shows the conspiracy, the tapes that show the conspiracy, with this defendant, unless he is doing something pursuant to whatever is described in the tapes? Well, you have the tapes of key, even if it's not the exact location, and maybe I took your question too narrowly. The exact location, I don't believe, was discussed in the tapes. The fact that they would meet at the day and time that they met the individuals involved, that was discussed on tapes. I think I just took your question a little too narrowly. All right. Well, so you say the time and the date. Yes. And it was then moved to a later time that same day. And the individuals. And the other important part, I mean, another thread taking the defendant back into the conspiracy is, after a meeting with the informant, Kiwis, and Enrique Bello, where they discuss, and there's a tape and they're talking about the 64 kilograms of cocaine, that they're going to do it the next day. Bello talks about how he still needs to find a car for the delivery. He then leaves and is followed to a meeting with defendant's van. And I say that because they weren't able to identify who was inside the van. But he meets with the exact van that is used the following day to transport the cocaine to the meeting. In addition, when they're actually inside the van, the informant is told by the defendant that he already has permission to give the cocaine to the informant, which the informant took as a reference to the fact that the people in Mexico, Martinez and Perez, had authorized him to receive, to have the cocaine released to him. Well, if all the jury heard was the tapes, all they heard was the tapes, and then they heard the evidence of this delivery and who was there, right? Correct. Would the evidence on the tape be sufficiently referable to the delivery so that you would know, the fact finder would know, that it is this delivery that's being described by the conspirators? Absolutely, Your Honor. Without the aid of any embellishment by this informant? Yes, Your Honor. The tapes are clear. And I take it then, too, that whatever is on the tape about this transaction that is to occur comes from people that you say are conspirators instead of from the government agent who cannot be a conspirator. That's correct, Your Honor. But also, in addition, the special agent was able to monitor the meetings, meetings inside the van and the meetings inside, and the other meetings. So she was also able to provide testimony regarding to what she heard the co-conspirators describing on those meetings. Okay. And any of the things that the counsel is pointing out here about having overdone the extent of the tapes about irrelevant or conspiracy that you're talking about or not? Yes. No, they are. They're all. And, you know, I may just have a moment to describe what I believe counsel is referring to. At some point, Kiwis, as often happens among criminals, decides to cheat his bosses. So what he wants the informant to do is to look at the cocaine that's being brought by the defendant. He asks him to reject that cocaine and that he will supply him with higher quality cocaine. He can get him 50 kilograms of better quality cocaine, and he'll do that in the near future. Okay. So that, I believe, is the reference. My time has run out. If there are any other questions. All right. Any rebuttal? Okay. Thank you. Thank you. That matter will stand submitted.
judges: Leavy, Pregerson, Beistline